## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:23-cr-20476-KMW

**UNITED STATES OF AMERICA**

**v.**

**TRAFIGURA BEHEER B.V.,**

        **Defendant.**

_____/

### **PLEA AGREEMENT**

The United States of America, by and through the Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the United States Attorney's Office for the Southern District of Florida (collectively, the "Offices"), and TRAFIGURA BEHEER B.V. (the "Defendant" or "Company"), by and through its undersigned attorneys, and through its authorized representative, pursuant to authority granted by the Defendant's Board of Directors, hereby submit and enter into this plea agreement (the "Agreement"), pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.  The terms and conditions of this Agreement are as follows:

#### Term of the Defendant's Obligations Under the Agreement

1. Except as otherwise provided in Paragraph 12 below in connection with the Defendant's cooperation obligations, the Defendant's obligations under the Agreement shall last and be effective for a period beginning on the date on which the Court accepts the Defendant's guilty plea and ending three (3) years from that date (the "Term").  The Defendant agrees, however, that in the event the Offices determine, in their sole discretion, that the Defendant has knowingly violated any

provision of this Agreement or failed to completely perform or fulfill each of the Defendant's obligations under this Agreement, the Offices, in their sole discretion, may impose an extension or extensions of the Term for up to a total additional time period of one (1) year, without prejudice to the Offices' right to proceed as provided in Paragraphs 26 through 29 below.  Any extension of the Term extends all terms of this Agreement, including the terms of the enhanced self-reporting described in Attachments D, E, and F, for an equivalent period.

### The Defendant's Agreement

2.      Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the Defendant agrees to waive its right to grand jury indictment and its right to challenge venue in the United States District Court for the Southern District of Florida, and to plead guilty to a one-count criminal Information charging the Defendant with Conspiracy to Violate the Foreign Corrupt Practices Act of 1977 (the "FCPA"), as amended, in violation of Title 18, United States Code, Section 371 and Title 15, United States Code, Section 78dd-3 (the "Information").  The Defendant further agrees to persist in that plea through sentencing and, as set forth below, to cooperate fully with the Offices in their investigation into the conduct described in this Agreement and the Statement of Facts attached hereto as Attachment A (the "Statement of Facts").

3.      The Defendant understands that, to be guilty of this offense, the following essential elements of the offense must be satisfied:

(a)      Two or more persons in some way agreed to try to accomplish a shared and unlawful plan; specifically, for a person or entity, while in the territory of the United States, to corruptly to make use of the mails and any means and instrumentalities of interstate commerce and to do any other act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of

2

value, to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the Defendant and its co-conspirators in obtaining and retaining business for and with, and directing business to, the Defendant and any person;

(b)      The Defendant knew the unlawful purpose of the plan and willfully joined in it;

(c)      During the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the Information; and

(d)      The overt act was at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

4.      The Defendant understands and agrees that this Agreement is between the Offices and the Defendant and does not bind any other division or section of the Department of Justice or any other federal, state, local, or foreign prosecuting, administrative, or regulatory authority. Nevertheless, the Offices will bring this Agreement and the nature and quality of the conduct, cooperation, and remediation of the Defendant, its direct or indirect affiliates, subsidiaries, and joint ventures, to the attention of other law enforcement, regulatory, and debarment authorities, as well as Multilateral Development Banks ("MDBs"), if requested by the Defendant.

5.     The Defendant agrees that this Agreement will be executed by an authorized corporate representative.  The Defendant further agrees that a resolution duly adopted by the Defendant's Board of Directors in the form attached to this Agreement as Attachment B ("Certificate of Corporate Resolutions") authorizes the Defendant to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant and its counsel are authorized by the Defendant's Board of Directors, on behalf of the Defendant.

6.     The Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement.

7.     The Offices enter into this Agreement based on the individual facts and circumstances presented by this case, including:

(a)     The nature and seriousness of the offense conduct, as described in the Statement of Facts, including a multi-year scheme to pay bribes to officials at Brazil's stateowned and state-controlled petroleum company, Petrobras, in exchange for obtaining and retaining business, which resulted in profits of approximately $61 million to the Defendant;

(b)     The Defendant did not receive voluntary disclosure credit pursuant to the Criminal Division Corporate Enforcement and Voluntary Self-Disclosure Policy (the "Corporate Enforcement and Voluntary Self-Disclosure Policy"), or pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 8C2.5(g)(1), because it did not voluntarily and timely disclose to the Fraud Section the conduct described in the Statement of Facts;

4

(c)     The Defendant received credit for its cooperation with the Offices'

investigation pursuant to U.S.S.G. § 8C2.5(g)(2) because it cooperated with the investigation and

demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct;

the Defendant also received credit for its cooperation and remediation pursuant to the Corporate

Enforcement and Voluntary Self-Disclosure Policy, by, among other things: (i) providing timely

updates on facts learned during its internal investigation related to conduct described in the

Statement of Facts; (ii) making factual presentations to the government; (iii) facilitating the

interviews of employees and agents, including an employee located outside the United States,

and arranging for counsel for employees where appropriate; and (iv) producing relevant

nonprivileged documents and data to the government, including documents located outside the

United States in ways that navigated foreign data privacy laws, accompanied by translations of

certain documents; however, the Defendant, in particular during the early phase of the

government's investigation, failed to preserve and produce certain documents and evidence in a

timely manner and, at times, took positions that were inconsistent with full cooperation;

(d)     The Defendant provided to the government all relevant facts known to it,

including information about individuals involved in the conduct described in the attached

Statement of Facts and conduct disclosed to the government prior to the Agreement;

(e)     The Defendant also received credit pursuant to the Corporate Enforcement

and Voluntary Self-Disclosure Policy because it engaged in remedial measures, including: (i)

developing and implementing enhanced, risk-based policies and procedures relating to, among

other things, anti-corruption, use of intermediaries and consultants, third party payments, and

joint venture and equity investment risk assessment; (ii) enhancing processes and controls around

high-risk transactions; (iii) investment of additional resources in employee training and compliance testing; (iv) enhancing ongoing compliance monitoring and controls testing processes; and (v) proactively discontinuing the use of third-party agents for business origination; however, the Defendant was slow to exercise disciplinary and remedial measures for certain employees whose conduct violated company policy;

(f)     The Defendant has enhanced and has committed to continuing to enhance its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program);

(g)     Based on the Defendant's remediation and the state of its compliance program, including its discontinuation of the use of third-party agents for business origination and other compliance enhancements noted above in subparagraph (e), and the Defendant's agreement to report to the Offices as set forth in Attachment D to this Agreement (Enhanced Corporate Compliance Reporting), the Offices determined that an independent compliance monitor was not necessary;

(h)     The prior misconduct of Trafigura Group entities, which is not recent but includes (i) Trafigura AG's 2006 guilty plea for violation of Title 18, United States Code, Section 542; as well as (ii) the Defendant's conviction in 2010 of violating Netherlands export and environmental laws in connection with the discharge of petroleum waste in Côte d'Ivoire;

(i)     The Defendant's anticipated resolution with authorities in Brazil, related

6

to conduct described in the Statement of Facts, which anticipated resolution the Offices will credit in connection with the criminal penalty specified in this Agreement; and

(j)     The Defendant's agreement to continue to cooperate with the Offices in any ongoing investigation as described in Paragraph 12 below.

(k)     Accordingly, after considering (a) through (j) above, as well as the fact that while the Defendant ultimately accepted responsibility for its criminal conduct, its prior posture in resolution negotiations also caused significant delays and required the Offices to expend substantial efforts and resources to develop additional admissible evidence before the Defendant constructively reengaged with the Offices in agreeing to a negotiated resolution, the Offices determined that the appropriate resolution in this case is for the Defendant to plead guilty to one count of conspiracy to violate the anti-bribery provisions of the FCPA pursuant to this Agreement; a criminal fine in the amount of $80,488,040, which reflects a discount of ten percent off the fifth percentile above the low end of the otherwise-applicable Sentencing Guidelines fine range, taking into account the Defendant's cooperation and remediation, as well as certain Trafigura Group entities' prior misconduct, pursuant to the Corporate Enforcement and Voluntary Self-Disclosure Policy; and forfeiture in the amount of $46,510,257.

8.     The Defendant agrees to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

(a)     to plead guilty as set forth in this Agreement;

(b)     to abide by all sentencing stipulations contained in this Agreement; (c) to appear, through its duly appointed representatives, as ordered for all court appearances, and obey any other ongoing court order in this matter, consistent with all applicable

7

U.S. and foreign laws, procedures, and regulations;

       (d)     to commit no further crimes;

       (e)     to be truthful at all times with the Court;

       (f)     to pay the applicable fine and special assessment;

       (g)     to consent to and to pay the applicable forfeiture amount;

       (h)     to cooperate fully with the Offices as described in Paragraph 12;

       (i)     to continue to implement a compliance and ethics program as described in Paragraphs 9 and 10 and Attachment C; and

       (j)     to report to the Offices annually during the Term regarding remediation and implementation of the compliance measures described in Attachment C, prepared in accordance with Attachment D of this Agreement.  In addition, no later than thirty (30) days after the filing of each such annual report, the parties will report to the Court on the status of the Defendant's compliance with its obligations under Attachments C and D of this Agreement.

9.     The Defendant represents that it has implemented and will continue to implement a compliance and ethics program that meets, at a minimum, the elements set forth in Attachment C.  Such program shall be designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws throughout its operations, including those of its affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with foreign officials or other activities carrying a high risk of corruption.  Thirty (30) days prior to the expiration of the Term, the Defendant, by the Chief Executive Officer and Chief Compliance Officer of Trafigura Group, will certify to the Offices, in the form of executing the document attached as Attachment F to this Agreement, that the Defendant has met its compliance obligations pursuant to this Agreement.  Each certification will be deemed a material statement and representation to the executive branch of the United States for purposes of Title 18, United States

Code, Sections 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

10.     In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Defendant represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal accounting controls, policies, and procedures regarding compliance with the FCPA and other applicable anti-corruption laws.  Where necessary and appropriate, the Defendant will adopt new or modify existing internal controls, compliance policies, and procedures in order to ensure that the Defendant maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws.  The compliance program, including the internal accounting controls system, will include, but not be limited to, the minimum elements set forth in Attachment C.

11.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Defendant agrees that in the event that, during the Term of the Agreement, the Defendant undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Defendant's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in Attachment A of the Agreement attached hereto, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.  The

purchaser or successor in interest must also agree in writing that the Offices' ability to determine a breach under this Agreement is applicable in full force to that entity. The Defendant agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Defendant shall provide notice to the Offices at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Offices shall notify the Defendant prior to such transaction (or series of transactions) if they determine that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If at any time during the Term of the Agreement the Defendant engages in a transaction that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Offices may deem it a breach of this Agreement pursuant to Paragraphs 26 through 29. Nothing herein shall restrict the Defendant from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Offices.

12. The Defendant shall cooperate fully with the Offices in any and all matters relating to the conduct described in this Agreement and Attachment A and any individual or entity referred to therein, as well as any other conduct under investigation by the Offices at any time during the Term, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded or the end of the Term. At the request of the Offices, the Defendant shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the MDBs, in any investigation of the Defendant, its subsidiaries or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and

Attachment A and other conduct under investigation by the Offices at any time during the Term. The Defendant's cooperation pursuant to this Paragraph is subject to applicable law and regulations, including data privacy and national security laws, as well as valid claims of attorneyclient privilege or attorney work product doctrine; however, the Defendant must provide to the

Offices a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Defendant bears the burden of establishing the validity of any such assertion. The Defendant agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

(a)     The Defendant represents that it has truthfully disclosed all relevant factual information about which the Defendant has any knowledge with respect to the Defendant's activities, those of its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants relating to the conduct described in the Information and Statement of Facts, as well as any other conduct known by the Defendant to be under investigation by the Offices. The Defendant further represents that it shall promptly and truthfully disclose all factual information with respect to its activities, those of its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants related to the conduct described in the Information and Statement of Facts, including any evidence or allegations and internal or external investigations, about which the Defendant gains any knowledge or about which the Offices have inquired or may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant to provide to the Offices, upon request, any document, record or other tangible evidence about which the Offices may inquire of the Defendant, including evidence that is responsive to any requests made prior to the execution of this Agreement.

(b)     Upon request of the Offices, the Defendant shall designate knowledgeable employees, agents, or attorneys to provide to the Offices the information and materials described in Paragraph 12(a) above on behalf of the Defendant.  It is further understood that the Defendant must at all times provide complete, truthful, and accurate information.

(c)     The Defendant shall use its best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents, and consultants of the Defendant.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities.   Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding the matters under investigation.

(d)     With respect to any information, testimony, documents, records or other tangible evidence provided to the Offices pursuant to this Agreement, the Defendant consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities including United States authorities and those of a foreign government, as well as the MDBs, of such materials as the Offices, in their sole discretion, shall deem appropriate.

13.     In addition to the obligations provided for in Paragraph 12 of the Agreement, during the Term, should the Defendant learn of any evidence or allegation of conduct that may constitute a violation of the FCPA anti-bribery provisions had the conduct occurred within the jurisdiction of the United States, the Defendant shall promptly report such evidence or allegation to the Offices. Thirty (30) days prior to the end of the term of the cooperation obligations provided for in Paragraph 1 of the Agreement, the Defendant, by the Chief Executive Officer and the Chief Financial Officer of Trafigura Group, will certify to the Offices, in the form of executing the

document attached as Attachment E to this Agreement, that the Defendant has met its disclosure obligations pursuant to this Paragraph. Each certification will be deemed a material statement and representation to the executive branch of the United States for purposes of Title 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

14.     The Defendant agrees that any fine or restitution imposed by the Court will be due and payable as specified in Paragraph 22 below, and that any restitution imposed by the Court will be due and payable in accordance with the Court's order. The Defendant further agrees to pay the Clerk of the Court for the United States District Court for the Southern District of Florida the mandatory special assessment of $400 at the time of sentencing.

<u>**The United States' Agreement**</u>

15. In exchange for the guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, the Offices agree they will not file additional criminal charges against the Defendant or any of its direct or indirect affiliates, parent company, subsidiaries, or joint ventures relating to the conduct described in the Statement of Facts or the Information filed pursuant to this Agreement. The Offices, however, may use any information related to the conduct described in the Statement of Facts against the Defendant: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code. This Agreement does not provide any protection against prosecution for any future conduct by the Defendant or any of its direct or indirect affiliates, subsidiaries, officers, directors, employees, agents, or consultants, whether or not disclosed by the Defendant pursuant to the terms of this Agreement. This Agreement does not provide any protection against prosecution of any individuals, regardless of

their affiliation with the Defendant.  The Defendant agrees that nothing in this Agreement is intended to release the Defendant from any and all of the Defendant's tax liabilities and reporting obligations for any and all income not properly reported and/or legally or illegally obtained or derived.

### Factual Basis

16. The Defendant is pleading guilty because it is guilty of the charge contained in the Information.  The Defendant admits, agrees, and stipulates that the factual allegations set forth in the Information and the Statement of Facts are true and correct, that it is responsible for the acts of its officers, directors, employees, and agents described in the Information and Statement of Facts, and that the Information and Statement of Facts accurately reflect the Defendant's criminal conduct.  The Defendant stipulates to the admissibility of the Statement of Facts in any proceeding by the Offices, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the attached Statement of Facts at any such proceeding.

### The Defendant's Waiver of Rights, Including the Right to Appeal

17.     Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn.  The Defendant expressly warrants that it has discussed these rules with its counsel and understands them.  Solely to the extent set forth below, the Defendant voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410.  The Defendant agrees that, effective as of the date the Defendant signs this Agreement, it will not dispute the Statement of Facts set forth in this Agreement, and that the Statement of Facts shall be admissible against the Defendant in any criminal case involving any of the Offices and the Defendant, as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment

evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing.  In addition, the Defendant also agrees not to assert any claim under the Federal Rules of Evidence (including Rule 410 of the Federal Rules of Evidence), the Federal Rules of Criminal Procedure (including Rule 11 of the Federal Rules of Criminal

Procedure), or the Sentencing Guidelines (including U.S.S.G. § 1B1.1(a)) that the Statement of Facts set forth in Attachment A to this Agreement should be suppressed or is otherwise inadmissible as evidence (in any form).  Specifically, the Defendant understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Offices have fulfilled all of their obligations under this Agreement and the Court has accepted the guilty plea, the Defendant nevertheless withdraws its guilty plea.

18.     The Defendant is satisfied that the Defendant's attorneys have rendered effective assistance.  The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as provided in this Agreement.  The Defendant understands that the rights of criminal defendants include the following:

(a)     the right to plead not guilty and to persist in that plea;

(b)     the right to a jury trial;

(c)     the right to be represented by counsel – and if necessary have the Court appoint counsel – at trial and at every other stage of the proceedings;

(d)     the right at trial to confront and cross-examine adverse witnesses, to testify and present evidence, and to compel the attendance of witnesses; and

(e)     pursuant to Title 18, United States Code, Section 3742, the right to appeal the sentence imposed.

Nonetheless, the Defendant knowingly waives the right to appeal or collaterally attack the conviction and any sentence within the statutory maximum described below (or the manner in which that sentence was determined) on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever except those specifically excluded in this Paragraph, in exchange for the concessions made by the Offices in this Agreement.  This Agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b).  The Defendant also knowingly waives the right to bring any collateral challenge to either the conviction, or the sentence imposed in this case.  The Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a.  The Defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution related to the conduct described in the Statement of Facts or the Information, including any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the Defendant violates this Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one (1) year of any such vacation of conviction, violation of the Agreement, or withdrawal of plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed.  The Defendant further waives the right to raise on appeal or on collateral review any argument that the statutes to which the defendant is pleading guilty is unconstitutional and/or the admitted conduct does not fall within the scope of the statutes.  The Offices are free to take any position on appeal or any other post-judgment matter.  The parties agree that any challenge to the Defendant's sentence that is not foreclosed by this Paragraph will be limited to that portion of the

sentencing calculation that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the Defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

## Penalty

19. The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 371 is: (a) a fine of $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest (Title 18, United States Code, Sections 371 and 3571(c) and (d)); (b) five (5) years' probation (Title 18, United States Code, Section 3561(c)(1)); (c) a mandatory special assessment of $400 (Title 18, United States Code, Section 3013(a)(2)(B)); (d) restitution in the amount ordered by the Court (Title 18, United States Code, Section 3663); and (e) criminal forfeiture as set forth below in Paragraph 22(c) (Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c)). In this case, the parties agree that the gross pecuniary gain resulting from the offense is $60,837,522. Therefore, pursuant to Title 18, United States Code, Section 3571(d), the maximum fine that may be imposed is twice the gross gain, or approximately $121,675,044.

## Sentencing Recommendation

20. The parties agree that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory sentencing guideline range pursuant to the Sentencing Guidelines. The Court will then determine a reasonable sentence within the statutory range after considering the advisory sentencing guideline range and the factors listed in Title 18, United States Code, Section 3553(a). The parties' agreement herein to any guideline sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof. The Defendant also understands that if the Court accepts this Agreement, the Court is bound by the sentencing provisions in Paragraph 19.

21. The Offices and the Defendant agree that a faithful application of the Sentencing

Guidelines to determine the applicable fine range yields the following analysis:

(a)     The November 1, 2023 Sentencing Guidelines are applicable to this matter.

(b)     <u>Offense Level</u>.  Based upon U.S.S.G. §§ 2C1.1 and 2X1.1, the total offense level is 36, calculated as follows:

| | |
|---|---|
| 2C1.1(a)(2)  Base Offense Level | 12 |
| 2C1.1(b)(1)  More than One Bribe | +2 |
| 2C1.1(b)(2)  Benefit (More than $25 Million) | +22 |
| **TOTAL** | 36 |

(c)     <u>Base Fine</u>.[1]  Based upon U.S.S.G. § 8C2.4(a)(2), the base fine is $60,837,522 (the pecuniary gain to the Defendant from the offense).

(d)     <u>Culpability Score</u>.  Based upon U.S.S.G. § 8C2.5, the culpability score is 7, calculated as follows:

| | |
|---|---|
| (a)     Base Culpability Score | 5 |
| (b)(2) 1,000 or More Employees and High-Level Personnel | +4 |
| (g)(2) Cooperation, Acceptance | <u>-2</u> |
| **TOTAL** | 7 |

<u>Calculation of Fine Range</u>:

| | |
|---|---|
| Base Fine | $60,837,522 |
| Multipliers | 1.4 (min) / 2.8 (max) |
| Fine Range | $85,172,530 (min) / $170,345,061 (max) |

---

[1] Because the conduct predates 2015, the offense level fine table set forth in the version of Section 8C2.4(d) in effect on November 1, 2014 has been used.  *See* U.S.S.G. § 8C2.4(e)(1) (2023).

22. Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Offices and the Defendant agree that the following represents the appropriate disposition of the case and recommend jointly that the Court impose the following sentence:

(a)     <u>Disposition</u>.  Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the Offices and the Defendant agree that the appropriate disposition of this case is as set forth above, and agree to recommend jointly that the Court, at a hearing to be scheduled at an agreed upon time, impose a sentence requiring the Defendant to pay a criminal fine, as set forth below. Specifically, the parties agree, based on the application of the Sentencing Guidelines, that the appropriate total criminal fine is $80,488,040 ("Total Criminal Fine").  This reflects a ten percent discount off the fifth percentile of the Sentencing Guidelines fine range, taking into account the Defendant's cooperation and remediation, as well as its prior history, pursuant to the Criminal Division's Corporate Enforcement and Voluntary Self-Disclosure Policy.

(b)     The Offices and the Defendant further agree that the Defendant will pay the United States Treasury $53,658,694, equal to approximately two thirds of the Total Criminal Fine, no later than ten (10) business days after entry of the judgment by the Court.  The Offices agree to credit the remaining amount of the Total Criminal Fine as follows: up to $26,829,346 of the Total Criminal Fine will be credited against the amount the Defendant pays to authorities in Brazil—so long as the Defendant pays such amount to Brazil pursuant to the Defendant's anticipated separate resolution with Brazilian authorities related to the bribery conduct specified in the Statement of Facts; provided that, in the event the Defendant does not pay Brazilian authorities any part of the $26,829,346 within twelve (12) months after the date this Agreement is accepted by the Court, the Defendant will be required to pay the full remaining amount to the United States Treasury within ten (10) business days of the expiration of such twelve-month period.

The Defendant and the Offices agree that the Total Criminal Fine is appropriate given the facts and circumstances of this case, including the factors described in Paragraph 7. The Total Criminal Fine is final and shall not be refunded. The Defendant shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to any fine, penalty, forfeiture, or disgorgement amounts that Defendant pays pursuant to the Agreement, or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in Attachment A. The Defendant further acknowledges that no tax deduction may be sought in connection with the payment of any part of the Total Criminal Fine. The Offices believe that a disposition that includes a fine of $80,488,040 is appropriate based on the factors outlined in Paragraph 7 of the Agreement and those in Title 18, United States Code, Section 3553(a).

(c)     Forfeiture. The Defendant acknowledges that it obtained and/or acquired property that is subject to forfeiture as a result of its violation of Title 18, United States Code, Section 371 and Title 15, United States Code, Section 78dd-3, as alleged in the Information. The Defendant consents to the entry of a forfeiture money judgment in the amount of forty-six million, five hundred ten thousand, two hundred fifty-seven dollars in U.S. Currency ($46,510,257.00) (the "Forfeiture Money Judgment"). The Defendant agrees that the amount of the Forfeiture Money Judgment and any payments toward the Forfeiture Money Judgment represent property, real or personal, constituting or derived from proceeds obtained directly or indirectly as a result of its violation of Title 18, United States Code, Section 371 and Title 15, United States Code, Section 78dd-3, and thus are forfeitable to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), in any administrative and/or judicial (civil or criminal) proceeding(s) at the Offices' exclusive discretion.

The Defendant consents to the entry of a Preliminary Order of Forfeiture pursuant to Rule

32.2 of the Federal Rules of Criminal Procedure, imposing the Forfeiture Money Judgment.  The Defendant shall pay the Forfeiture Money Judgment no later than ten (10) business days after entry of the judgment by the Court or the Defendant's receipt of payment instructions, whichever is later. If the Defendant fails to pay any portion of the Forfeiture Money Judgment as set forth above, Defendant acknowledges that the failure to pay is based on an act or omission of the Defendant that resulted in the unavailability of such portion of the Forfeiture Money Judgment consistent with Title 21, United States Code, Section 853(p)(1)(A)-(E).  All payments made toward the Forfeiture Money Judgment shall be made payable pursuant to written instructions provided by the Offices.  The Defendant consents to the restraint of all payments made toward the Forfeiture Money Judgment.

The Defendant further agrees that forfeiture is independent of any assessment, fine, cost, restitution, or penalty that may be imposed by the Court, and agrees that the entry and payment of the Forfeiture Money Judgment are not to be considered a payment of a fine, penalty, restitution loss amount, or any income taxes that may be due, and shall survive bankruptcy or any sale, merger, transfer of business operations or change in corporate form, as set forth in paragraph 11 of this Agreement.  The Defendant knowingly and voluntarily agrees to waive all constitutional, legal, and equitable defenses to the forfeiture, including excessive fines under the Eighth Amendment to the United States Constitution.  In addition, the Defendant agrees to waive: any applicable time limits for administrative or judicial forfeiture proceedings, the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a), and Title 18, United States Code, Section 983, as well as any appeal of the forfeiture.

If the Defendant fails to pay the Forfeiture Money Judgment within the time set forth above, the Defendant agrees to fully and truthfully disclose the existence, nature and location of all assets

in which the Defendant has or had any direct or indirect financial interest or control, and any assets involved in the offense of conviction. The Defendant agrees to take all steps requested by the Offices for the recovery and forfeiture of all assets identified by the Offices as subject to forfeiture. This includes, but is not limited to, the timely delivery upon request of all necessary and appropriate documentation to deliver good and marketable title, consenting to all orders of forfeiture, and not contesting or impeding in any way with any criminal, civil or administrative forfeiture proceeding concerning the forfeiture.

(d) <u>Mandatory Special Assessment</u>. The Defendant shall pay to the Clerk of the Court for the United States District Court for the Southern District of Florida the mandatory special assessment of $400 at the time of sentencing.

23. This Agreement is presented to the Court pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement contemplated. The Defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.

24. The Defendant and the Offices waive the preparation of a Pre-Sentence Investigation Report ("PSR") and intend to seek a sentencing by the Court immediately following the Rule 11 hearing in the absence of a PSR. The Defendant understands that the decision whether to proceed with the sentencing proceeding without a PSR is exclusively that of the Court. In the event the Court directs the preparation of a PSR, the Offices will fully inform the preparer of the

PSR and the Court of the facts and law related to the Defendant's case.

## Enhanced Corporate Compliance Reporting

25. As described in Paragraph 8(j), the Defendant agrees that it will report to the Offices annually during the Term regarding remediation and maintenance of the compliance measures described in Attachment C.  This reporting will be conducted in accordance with Attachment D.

## Breach of Agreement

26.   If the Defendant: (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraph 12 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraphs 9 and 10 of this Agreement and Attachment C; (e) fails to satisfy the enhanced compliance reporting requirements set forth in Paragraph 25 of this Agreement and Attachment D; (f) commits any acts that, had they occurred within the jurisdictional reach of the FCPA, would be a violation of the FCPA; or (g) otherwise fails specifically to perform or to fulfill completely each of the Defendant's obligations under the Agreement, regardless of whether the Offices become aware of such a breach after the Term, the Defendant shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, the charge in the Information described in Paragraph 3, which may be pursued by the Offices in the United States District Court for the Southern District of Florida or any other appropriate venue.  Determination of whether the Defendant has breached the Agreement and whether to pursue prosecution of the Defendant shall be in the Offices' sole discretion.  The Court is retaining jurisdiction, however, to resolve any dispute as to the alleged breach of any provision of this Agreement during the Term.  Any prosecution of the Defendant may be premised on information provided by the Defendant or its personnel.  Any such prosecution relating to the conduct described in the Information and the attached Statement of Facts or relating to conduct

known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term of the Agreement plus one (1) year.  Thus, by signing this Agreement, the Defendant agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term of the Agreement plus one (1) year.  The Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement.  In addition, the Defendant agrees that the statute of limitations as to any violation of federal law that occurs during the term of the cooperation obligations provided for in Paragraph 12 of the Agreement will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the Term plus five (5) years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

27.     In the event the Offices determine that the Defendant has breached this Agreement, the Offices agree to provide the Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within thirty (30) days of receipt of such notice, the Defendant shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions the Defendant has taken to address and remediate the situation, which explanation the Offices shall consider in determining whether to pursue prosecution of the Defendant.

28.     In the event that the Offices determine that the Defendant has breached this Agreement: (a) all statements made by or on behalf of the Defendant to the Offices or to the Court,

including the Information and the Statement of Facts, and any testimony given by the Defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Offices against the Defendant; and (b) the Defendant shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Defendant, will be imputed to the Defendant for the purpose of determining whether the Defendant has violated any provision of this Agreement shall be in the sole discretion of the Offices.

29.    The Defendant acknowledges that the Offices have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant breaches this Agreement and this matter proceeds to judgment.  The Defendant further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

## Public Statements by the Defendant

30.    The Defendant expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above or the facts described in the Information and Statement of Facts. Any such contradictory statement shall, subject to cure rights of the Defendant described below, constitute a breach of this Agreement, and the Defendant thereafter shall be subject to prosecution

as set forth in Paragraphs 26 through 29 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the Information or Statement of Facts will be imputed to the Defendant for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Offices.  If the Offices determine that a public statement by any such person contradicts in whole or in part a statement contained in the Information or Statement of Facts, the Offices shall so notify the Defendant, and the Defendant may avoid a breach of this Agreement by publicly repudiating such statement(s) within five (5) business days after notification.  The Defendant shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Information and Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or Statement of Facts.  This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Defendant in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant.

31.    The Defendant agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the Offices to determine: (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Offices and the Defendant; and (b) whether the Offices have any objection to the release or statement.

**Complete Agreement**

32.     This document, including its attachments, states the full extent of the Agreement between the parties.   There are no other promises or agreements, express or implied.   Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

**AGREED:**

**FOR TRAFIGURA BEHEER B.V.:**

By: _____     Date: ___A March 2024___
Tim Baker
Co-General Counsel, Trafigura Group
On behalf of Trafigura Beheer B.V.


By: _____     Date: ___1st March 2024___
Emma Walton
Co-General Counsel, Trafigura Group
On behalf of Trafigura Beheer B.V.


By: _____     Date: _____
David A. O'Neil
Jane Shvets
Bruce E. Yannett
Debevoise & Plimpton LLP
Counsel for Trafigura Beheer B.V.

**FOR THE U.S. DEPARTMENT OF JUSTICE:**

GLENN S. LEON                           MARKENZY LAPOINTE
Chief, Fraud Section                    United States Attorney
Criminal Division                       Southern District of Florida
U.S. Department of Justice

By: _____     By: _____
Natalie R. Kanerva, Trial Attorney       Eli S. Rubin
Clayton P. Solomon, Trial Attorney       Assistant United States Attorney
Derek J. Ettinger, Assistant Chief
Jonathan P. Robell, Assistant Chief

28

## ATTACHMENT A

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Plea Agreement between the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Southern District of Florida (collectively, the "United States") and the Defendant Trafigura Beheer B.V. ("Trafigura" or the "Company"). Certain of the facts herein are based on information obtained from third parties by the United States through its investigation and described to Trafigura. Trafigura hereby agrees and stipulates that the following information is true and accurate. Trafigura admits, accepts and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. The following facts took place during the relevant time frame and establish beyond a reasonable doubt the charges set forth in the criminal Information filed in connection with this Agreement:

### Relevant Entities and Individuals

1.    Trafigura was a Dutch-registered company with its principal place of business in Switzerland. Trafigura, together with its subsidiaries and affiliated entities, operated as one of the largest oil distributors and energy commodities trading groups in the world.

2.    Trafigura Pte. Ltd. ("Trafigura Singapore") was a Singaporean-registered company based in Singapore and a subsidiary of Trafigura. Trafigura Singapore and its employees were agents of Trafigura, as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-3(a).

3.    "Trafigura Executive 1," an individual whose identity is known to the United States and the Company, was a French citizen. Trafigura Executive 1 was a high-level executive at Trafigura who exercised substantial control over Trafigura and its subsidiaries and affiliated

entities until in or around 2015.  Trafigura Executive 1 was an officer, agent, and stockholder of Trafigura, as those terms are used in the FCPA, Title 15 United States Code, Section 78dd-3(a).

4.      "Trafigura Executive 2," an individual whose identity is known to the United States and the Company, was a Brazilian citizen.  Trafigura Executive 2 was an agent or executive of Trafigura and several of its subsidiaries and affiliated entities. From in or around 2009 to 2015, Trafigura Executive 2 was directly supervised by Trafigura Executive 1.  Trafigura Executive 2 was an officer, agent, and stockholder of Trafigura, as those terms are used in the FCPA, Title 15 United States Code, Section 78dd-3(a).

5.      "Co-Conspirator 1," an individual whose identity is known to the United States and the Company, was a citizen of Brazil and the United States.  From the early 2000s until in or around 2008, Co-Conspirator 1 was a Petrobras (as defined below) trader based in Houston, Texas, and a foreign official as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A). From approximately 2010 until 2015, Co-Conspirator 1 was an employee of Trafigura's Brazilian subsidiary, was directly supervised by Trafigura Executive 2, and was an agent of Trafigura, as that term is used in the FCPA, Title 15 United States Code, Section 78dd-3(a).

6.      "Co-Conspirator 2," an individual whose identity is known to the United States and the Company, was a Brazilian citizen and an agent of Trafigura and Trafigura Singapore, as that term is used in the FCPA, Title 15 United States Code, Section 78dd-3(a).

7.      "Co-Conspirator 3," an individual whose identity is known to the United States and the Company, was a Brazilian illicit-market money dealer who, among other things, used foreign exchange transactions to convert wire transfers made in U.S. dollars and other non-Brazilian currencies into Brazilian currency to be delivered in cash in Brazil.

8.      Petróleo Brasileiro S.A. – Petrobras (together with its subsidiaries and affiliates, "Petrobras") was a Brazilian state-owned and state-controlled oil company headquartered in Rio de Janeiro, Brazil, that operated to refine, produce, and distribute oil, oil products, gas, biofuels and energy. Petrobras was controlled by Brazil and performed government functions and was an agency and instrumentality of a foreign government, and Petrobras's officers and employees were foreign officials, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

9.      Rodrigo Berkowitz ("Berkowitz"), a Brazilian citizen, was a fuel oil trader for Petrobras who worked in Rio de Janeiro, Brazil, and Houston, Texas. Berkowitz was a foreign official, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

10.     "Brazilian Official 1," an individual whose identity is known to the United States and the Company, was a Brazilian citizen and trading manager for Petrobras in Rio de Janeiro, Brazil. Brazilian Official 1 was a foreign official, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

11.     "Brazilian Official 2," an individual whose identity is known to the United States and the Company, was a Brazilian citizen and trading manager for Petrobras in Rio de Janeiro, Brazil. Brazilian Official 2 was a foreign official, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

12.     "Brazilian Official 3," an individual whose identity is known to the United States and the Company, was a Brazilian citizen and trading manager for Petrobras in Rio de Janeiro, Brazil. Brazilian Official 3 was a foreign official, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

13.     "Brazilian Official 4," an individual whose identity is known to the United States and the Company, was a Brazilian citizen and trading manager for Petrobras in Rio de Janeiro, Brazil. Brazilian Official 4 was a foreign official, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

**The Bribery Scheme**

14.     In or around and between 2003 and 2014, Trafigura knowingly and willfully conspired and agreed with others to offer and pay approximately $19.7 million in corrupt commissions, portions of which were used to pay bribes to, and for the benefit of, Brazilian officials, in order to secure improper advantages and to obtain and retain business for Trafigura with Petrobras in connection with the purchase and sale of oil products.

*Bribes to Co-Conspirator 1 and Brazilian Official 1*

15.     In or about 2003, while working in Brazil as an agent of Trafigura, Trafigura Executive 2 interfaced with Co-Conspirator 1, who, at that time, worked as a trader for Petrobras's subsidiary in Houston, Texas. Co-Conspirator 1 told Trafigura Executive 2 that, in order to get business related to the Caribbean market, Trafigura would need to pay bribes to Co-Conspirator 1. Trafigura Executive 2 agreed and used part of the commissions he received from Trafigura to pay the bribes.

16.     Specifically, Trafigura Executive 2 agreed to pay, and paid, bribes to Co-Conspirator 1 for the benefit and on behalf of Trafigura in the amount of approximately 5 to 10 cents per barrel of oil products bought from or sold to Petrobras. In total, between in or about 2003 and 2008, Trafigura Executive 2 paid Co-Conspirator 1, who at the time was a Petrobras official, approximately $500,000 in bribes for the benefit of Trafigura. During the course of the scheme, Trafigura Executive 2 and Co-Conspirator 1 falsely described the bribe payments as "commissions" in emails and other communications.

17.     In or about and between 2003 and 2008, Trafigura Executive 2 also paid bribes to Brazilian Official 1 in connection with trades between Trafigura and Petrobras. Trafigura Executive 2 and Brazilian Official 1 agreed to prices for trades of oil products and bribe amounts for each trade. After the price had been determined, Trafigura Executive 2 instructed Trafigura traders to engage in negotiations with Petrobras, which Trafigura Executive 2 knew to be a sham, in order to arrive at the pre-agreed price.

18.     Trafigura Executive 2 used varied methods to pay the bribes to Co-Conspirator 1 and Brazilian Official 1, including cash deliveries and wire transfers. Cash deliveries took place at meetings in Brazil following the completion of trades. To generate the cash for the bribe payments, Trafigura Executive 2 typically used illicit-market money exchangers in Brazil commonly referred to as "doleiros."

19.     In or around 2006, Trafigura Executive 2 moved to Europe at Trafigura Executive 1's request, and worked as an advisor to Trafigura Executive 1. In or around 2009, Trafigura Executive 2 became the chief executive officer of a Trafigura-affiliated joint venture based in Singapore.

### Bribes to Brazilian Official 2 and Berkowitz

20.     In or around 2009, Co-Conspirator 1 left Petrobras and began working as an agent for Trafigura in Brazil. In or around the same time, Brazilian Official 2 replaced Brazilian Official 1 at Petrobras. After taking over, Brazilian Official 2 told Trafigura Executive 2 that Trafigura would have to pay a bribe on every deal between Trafigura and Petrobras. Trafigura Executive 2 agreed to pay bribes to Brazilian Official 2 of up to 20 cents per barrel of oil products traded between Petrobras and Trafigura.

21.     Trafigura Executive 2 instructed Co-Conspirator 1 to make the bribe payments to Brazilian Official 2 on Trafigura's behalf. In order to conceal the bribe payments, Trafigura

5

agreed with at least one shell company controlled by Co-Conspirator 1. Co-Conspirator 1 sent invoices on behalf of a shell company to Trafigura Executive 2, who paid the invoices on Trafigura's behalf via other shell companies or through Co-Conspirator 3. Having received the funds from Trafigura Executive 2 on behalf of Trafigura, Co-Conspirator 1 then met with Petrobras officials in person in Brazil, on behalf of Trafigura, to pay the bribes in cash.

22.     In or around 2010, Co-Conspirator 1 became a Trafigura employee based in Brazil and continued to receive funds via shell companies Co-Conspirator 1 controlled, in order to make bribe payments to Petrobras officials.

23.     Also in or around 2010, Co-Conspirator 1 paid bribes to Berkowitz on behalf of Trafigura by delivering cash in Brazil to a relative of Berkowitz. They typically met at Trafigura's office in Rio de Janeiro to exchange the cash, which the relative then held on Berkowitz's behalf until Berkowitz could pick it up in Brazil. On numerous occasions, Co-Conspirator 1 and Berkowitz also met in Houston, Texas, to discuss the bribes.

### Bribes to Brazilian Official 3 and Brazilian Official 4

24.     In or around 2011, Trafigura continued the bribery scheme when Brazilian Official 3 and Brazilian Official 4 came into positions of influence within Petrobras. Trafigura Executive 2 and Co-Conspirator 1 agreed to continue paying bribes, through Co-Conspirator 1, to Petrobras officials, including Berkowitz and Brazilian Official 3, in order to obtain and retain business with Petrobras for Trafigura.

25.     Initially, Trafigura Executive 2 and Co-Conspirator 1, acting on behalf of Trafigura, arranged for Co-Conspirator 1 to receive commissions that would be used to pay bribes to Petrobras officials, including Berkowitz, Brazilian Official 3, and Brazilian Official 4.

26.     Subsequently, on or about October 23, 2011, Co-Conspirator 1, acting for and on behalf of Trafigura, arrived at Miami International Airport in the Southern District of Florida.

27.     On or about October 24, 2011, Co-Conspirator 1, Berkowitz, Brazilian Official 3, Brazilian Official 4, and others met at a conference in Miami Beach, Florida, where they discussed the scheme and agreed that Trafigura would continue to pay bribes, on a per-barrel basis to Petrobras officials.

28.     On or about December 10, 2012, Trafigura Executive 2 sent an email to Co-Conspirator 2 with the subject line "Agency Agreement," asserting, in Portuguese and in sum and substance, "I have spoken with [Trafigura Executive 1] and [another Trafigura executive] who approve."

29.     On or about December 18, 2012, Trafigura Executive 1 and Trafigura Executive 2, acting on behalf of Trafigura, caused Trafigura Singapore to enter into an intermediary agreement with Co-Conspirator 2, referred to above in paragraph 28, pursuant to which Trafigura Singapore, acting through Trafigura Executive 1 and Trafigura Executive 2, would pay Co-Conspirator 2 commissions. Trafigura Executive 1 and Trafigura Executive 2 knew and intended that a portion of those commissions would be paid as bribes to foreign officials, including Brazilian Official 3, for the benefit of Trafigura.

30.     On or about December 19, 2012, following execution of the intermediary agreement, Co-Conspirator 2 signed an invoice addressed to Trafigura Singapore charging $500,000 for purported consultancy services, and providing account information for a bank account in Switzerland.

31.     Trafigura Singapore, for the benefit and on behalf of Trafigura, paid the invoice on or about January 22, 2013, transferring the Euro equivalent of approximately $500,000 to Co-Conspirator 2.

32.     In order to calculate the bribes owed to Petrobras officials, including Brazilian Official 3, Trafigura Executive 2 and Co-Conspirator 2, acting on behalf of Trafigura, obtained information from Co-Conspirator 1 regarding Trafigura trades with Petrobras. Trafigura Executive 2, acting on information received from other Trafigura executives, then instructed Co-Conspirator 2 on the particular trades between Petrobras and Trafigura that should be linked to Co-Conspirator 2's commissions, in an effort to facilitate the bribe payments and conceal them as legitimate transactions on Trafigura's books. For example:

(a)     On or about January 7, 2013, Trafigura Executive 2 emailed Co-Conspirator 1, copying Co-Conspirator 2, asking Co-Conspirator 1, in Portuguese and in sum and substance, to arrange a meeting between Co-Conspirator 2 and his "friend from Petrobras."

(b)     On or about January 9, 2013, Co-Conspirator 2 sent an email to Trafigura Executive 2 containing a chart showing the money owed to Petrobras officials, Co-Conspirator 1, and Co-Conspirator 2 in connection with various Trafigura trades.

(c)     On or about January 22, 2013, Trafigura Executive 2 emailed two other Trafigura executives, stating, "we have transferred [the] equivalent of 500,000 US$[.] need to transfer the difference of 66,388 U[S]$." In the email, Trafigura Executive 2 asked for a "reference number" for $566,388 "so [Co-Conspirator 2] can issue his invoice."

(d)     On or about January 22, 2013, a Trafigura executive responded to Trafigura Executive 2's email referenced in subparagraph (c) above, stating: "Deal will be 76707."

33.     Co-Conspirator 2, using the information received from Co-Conspirator 1 and Trafigura Executive 2, and the deal reference numbers received from Trafigura, then invoiced Trafigura Singapore for a purported commission under the intermediary agreement. For

example, on or about January 22, 2013, Co-Conspirator 2 signed an invoice addressed to Trafigura Singapore seeking $66,388 for purported consultancy services relating to deal number 76707, and providing bank account information for a bank account in Switzerland.

34.   Trafigura Singapore, for the benefit and on behalf of Trafigura, paid the invoice on or about February 5, 2013, transferring the Euro equivalent of approximately $66,388 to Co-Conspirator 2.

35.   Trafigura Executive 2 and Co-Conspirator 2 tracked bribe payments to Brazilian Official 3 and others using spreadsheets sent via email. For example, on or about March 18, 2013, Co-Conspirator 2 emailed Trafigura Executive 2 to discuss bribe payments due to Brazilian Official 3, stating, in Portuguese and in sum and substance and relevant part:

> I was with [Brazilian Official 3] yesterday, who gave me his spreadsheet, which is attached.
>
> 1) It includes shipments from 2011, which are not included in your information . . . . Shipments not included are: 380,000 bbl — FO Sep 1-12, 2011 - Value: $76,000 420,000 bbl — FO Oct 07-31,2011— Value: $84,000 240,000 bbl - FO Oct 07-31,2011— Value: $48,000 Total $208,000.
>
> 2) At the same time he puts OK on these shipments (as having been settled through the new method ??/). 3)On the other hand, all other shipments appear as pending, while we pay a total of $435,200, . . . according to your attached email. 4) New shipments, October/2012 to January 2013, total 1,600,000 bbl or $320,000. 5) Thus, the main point to be clarified is whether the 208,000 in item 1 are really due. Please verify. 6) I will also detail the allocation of . . . shipments from May to August 2012 against the total paid of $435,200.

36.   Similarly, on or about September 16, 2013, Co-Conspirator 2 sent an email to Trafigura Executive 2 with the subject line "Fuel Oil Petrobras," discussing in Portuguese bribe amounts owed to Brazilian Official 3.

37.     Co-Conspirator 1 also continued to receive payments during this portion of the scheme.  On or about May 15, 2013, Trafigura Executive 2 emailed Co-Conspirator 2 stating that Co-Conspirator 1 should be paid approximately $44,000 in connection with the scheme.

38.     In order to facilitate delivery of the bribes in Brazil, Co-Conspirator 2 contacted Co-Conspirator 3 and told Co-Conspirator 3 how much cash was needed in Brazil.  Co-Conspirator 3 then directed Co-Conspirator 2 to initiate wire transfers into specified accounts outside Brazil, several of which transfers moved through a financial institution in the United States.  After receipt of the funds in the account outside Brazil, Co-Conspirator 3 caused cash to be delivered to Co-Conspirator 2 in Brazil, and Co-Conspirator 2, acting on behalf of Trafigura, delivered cash to Brazilian Official 3 in furtherance of the bribery scheme.  For example:

(a)     On or about August 29, 2013, Co-Conspirator 2 sent to Trafigura an invoice for $254,400 for purported "consulting services related to development of Oil businesses."

(b)     On or about September 17, 2013, Trafigura Singapore, for the benefit and on behalf of Trafigura, paid the Euro equivalent of approximately $254,400 to Co-Conspirator 2.

(c)     On or about September 17, 2013, Co-Conspirator 3 sent Co-Conspirator 2 wire transfer instructions for a payment of $254,400 to the Hong Kong bank account of a Chinese company associated with Co-Conspirator 3.

(d)     On or about September 20, 2013, Co-Conspirator 2 transferred $254,400 to the Hong Kong bank account in the name of the Chinese company associated with Co-Conspirator 3 referenced in subparagraph (c) above, through a financial institution in the United States, for the ultimate benefit of Petrobras officials.

10

(e)     On or about February 7, 2014, Trafigura Executive 2 forwarded an email to Co-Conspirator 2 with the subject line "PB 2013" with information about the volumes of fuel oil that were part of Petrobras deals with a Trafigura subsidiary.  At the bottom of the email, the total volume was multiplied by .24 for a total of 390,240.  In the email, Trafigura Executive 2 had added, in Portuguese and in sum and substance, "[Co-Conspirator 2] this is correct, please send an invoice."

(f)     On or about February 7, 2014, Co-Conspirator 2 sent an email to Trafigura Executive 2 attaching an invoice for $390,240 for purported "consulting services related to development of Oil businesses."

(g)     On or about February 10, 2014, Co-Conspirator 3 sent Co-Conspirator 2 an invoice for $390,240 from a Hong Kong company for purported "consulting services for prospection, purchase and logistic procedures for floor and wall tiles from Brazil."

(h)      On or about February 12, 2014, Trafigura Singapore sent instructions to its bank to pay $390,240 to Co-Conspirator 2.  Trafigura Singapore's bank executed the instructions the same day by paying the Euro equivalent of approximately $390,240 to Co-Conspirator 2 for the benefit and on behalf of Trafigura.

(i)     On or about February 17, 2014, Co-Conspirator 2 transferred $390,240 to a Hong Kong bank account in the name of the Hong Kong company referenced in subparagraph (g) above, through a financial institution in the United States, for the ultimate benefit of Petrobras officials.

39.     In total, Trafigura Executive 2, acting on behalf of Trafigura, together with Co-Conspirator 1, Co-Conspirator 2, and Co-Conspirator 3 caused Trafigura Singapore to use the means and instrumentalities of interstate commerce to make payments of more than

11

approximately $1.63 million in commissions to Co-Conspirator 2, a portion of which was used to pay bribes to Petrobras officials, including, but not limited to, Brazilian Official 3, all on behalf of Trafigura.

40.    Between in or around 2003 and 2014, Trafigura entities earned approximately $61 million in profits from Trafigura's corruptly obtained business with Petrobras.  As a result of the above-described conduct, the Defendant obtained approximately $46,510,257 in criminally derived proceeds.

**ATTACHMENT B**

**CERTIFICATE  OF CORPORATE  RESOLUTIONS**

WHEREAS, TRAFIGURA BEHEER B.V. (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, fraud Section (the "Fraud Section"), and the United States Attorney's Office for the Southern District ·of Florida (the "USAO-SDFL") (collectively, the "Offices") regarding issues arising in relation to the Offices' investigation of violations of Title 18, United States Code, Section 371, Conspiracy, and Title 15, United States Code, Section 78dd-3, the Foreign Corrupt Practices Act, by certain of the Company's employe and agents;

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Offices (the "Agreement"); and

WHEREAS, Trafigura Group's Co-General Counsels, Tim Baker and Emma Walton, together with Trafigura Group's Senior Counsel, Graham O'Donoghue, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such Agreement with the Offices;

Therefore, the Board of Directors has RESOLVED that:

1.    The Company: (a) acknowledges the filing of the one-count Information charging the Company with violating Title 18, United States Code, Section 371, and Title 15, United States Code, Section 78dd-3; (b) waives indictment on such charges and enters into the Agreement with the Offices; (c) agrees to accept a monetary penalty against Company totaling $80,488,040 and forfeiture totaling $46,510,257 under the Agreement with respect to the conduct described in the Information, and to pay such penalty and forfeiture to the United States Treasury with respect to

the conduct described in the Infonnation; and (d) admits the Court's jurisdiction over the Company and the subject matter of such action and consents to the judgment therein;

2. The Company accepts the tenns and conditions of the Agreement, including, but not limited to:(a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the attached Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of the Agreement, in the United States District Court for the Southern District of Florida; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Offices prior to the date on which the Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of the Agreement;

3. Trafigura Group's Co-General Counsels, Tim Baker and Emma Walton, and Trafigura Group's Senior Counsel, Graham O'Donoghue, are hereby each authorized, empowered and directed, on behalf of the Company, to execute the Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as Trafigura Group's Co-General Counsels, Tim Baker and Emma Walton, and Trafigura Group's Senior Counsel, Graham O'Donoghue, may approve;

4. Trafigura Group's Co-General Counsels, Tim Bak.er and Emma Walton, and Trafigura Group's Senior Counsel, Graham O'Donoghue, are hereby each authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the fonns, tenns or provisions of any agreement or other docwncnts as may be

B-2

necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

     5.    All of the actions of Trafigura Group's Co-General Counsels, Tim Baker and Emma Walton, and Trafigura Group's Senior Counsel, Graham O'Donoghue, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

**ATTACHMENT C**

**CORPORATE COMPLIANCE PROGRAM**

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.*, and other applicable anti-corruption laws, TRAFIGURA BEHEER B.V. (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws (collectively, the "anti-corruption laws"). At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*Commitment to Compliance*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to compliance with its corporate policy against violations of the anti-corruption laws, its compliance policies, and its Code of Conduct, and demonstrate rigorous support for compliance principles via their actions and words.

2.      The Company will ensure that mid-level management throughout its organization reinforce leadership's commitment to compliance policies and principles and encourage

employees to abide by them.   The Company will create and foster a culture of ethics and compliance with the law in their day-to-day operations at all levels of the Company.

*Periodic Risk Assessment and Review*

3.      The Company will implement a risk management process to identify, analyze, and address the individual circumstances of the Company, in particular the foreign bribery risks facing the Company.

4.      On the basis of its periodic risk assessment, the Company shall take appropriate steps to design, implement, or modify each element of its compliance program to reduce the risk of violations of the anti-corruption laws, its compliance policies, and its Code of Conduct.

*Policies and Procedures*

5.      The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the anti-corruption laws, which shall be memorialized in a written compliance policy or policies.

6.      The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-corruption laws and the Company's compliance policies and Code of Conduct, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the anti-corruption laws by personnel at all levels of the Company. These anti-corruption policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in a foreign jurisdiction, including but not limited to, agents and business partners.  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company.  Such policies and procedures shall address:

       (a)     gifts;

       (b)     hospitality, entertainment, and expenses;

       (c)     customer travel;

       (d)     political contributions;

       (e)     charitable donations and sponsorships;

       (f)     facilitation payments; and

       (g)     solicitation and extortion.

7.    The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts. This system should be designed to provide reasonable assurances that:

       (a)     transactions are executed in accordance with management's general or specific authorization;

       (b)     transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

       (c)     access to assets is permitted only in accordance with management's general or specific authorization; and

       (d)     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

8.    The Company shall review its anti-corruption compliance policies and procedures as necessary to address changing and emerging risks and update them as appropriate to ensure

their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Independent, Autonomous, and Empowered Oversight*

9.      The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-corruption compliance policies and procedures. Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Company's Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources, authority, and support from senior leadership to maintain such autonomy.

*Training and Guidance*

10.      The Company will implement mechanisms designed to ensure that its Code of Conduct and anti-corruption compliance policies and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose a corruption risk to the Company, and, where necessary and appropriate, agents and business partners; and (b) metrics for measuring knowledge retention and effectiveness of the training. The Company will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

11.      The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and

appropriate, agents and business partners, on complying with the Company's anti-corruption compliance policies and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

*Confidential Reporting Structure and Investigation of Misconduct*

12.     The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Company's Code of Conduct or anti-corruption compliance policies and procedures.

13.     The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Company's anti-corruption compliance policies and procedures.

*Compensation Structures and Consequence Management*

14.     The Company will implement clear mechanisms to incentivize behavior amongst all directors, officers, employees, and, where necessary and appropriate, parties acting on behalf of the Company that comply with its corporate policy against violations of the anti-corruption laws, its compliance policies, and its Code of Conduct. These incentives shall include, but shall not be limited to, the implementation of criteria related to compliance in the Company's compensation and bonus system.

15.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Company's Code of Conduct and anti-corruption compliance policies and procedures by the Company's directors, officers, and

employees. Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, Code of Conduct, and compliance policies and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

*Third-Party Management*

16.     The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

(a)     properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

(b)     informing agents and business partners of the Company's commitment to abiding by anti-corruption laws, and of the Company's Code of Conduct and anti-corruption compliance policies and procedures; and

(c)     seeking a reciprocal commitment from agents and business partners.

17.     The Company will understand and record the business rationale for using a third party in a transaction and will conduct adequate due diligence with respect to the risks posed by a third-party partner such as a third-party partner's reputations and relationships, if any, with foreign officials. The Company will ensure that contract terms with third parties specifically describe the services to be performed, that the third party is actually performing the described work, and that its compensation is commensurate with the work being provided in that industry and geographical

region. The Company will engage in ongoing monitoring and risk management of third-party relationships through updated due diligence, training, audits, and/or annual compliance certifications by the third party.

18.     Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include: (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-corruption laws, the Company's Code of Conduct or compliance policies, or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

19.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate FCPA and anti-corruption due diligence by legal, accounting, and compliance personnel.

20.     The Company will ensure that the Company's Code of Conduct and compliance policies and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

        (a)     train the directors, officers, employees, agents, and business partners consistent with Paragraph 8 above on the anti-corruption laws and the Company's compliance policies and procedures regarding anti-corruption laws;

(b)       where warranted, conduct an FCPA-specific audit of all newly acquired or merged businesses as quickly as practicable; and

(c)       where warranted, establish a plan to integrate the acquired businesses or entities into the Company's enterprise resource planning systems as quickly as practicable.

*Monitoring and Testing*

21.       The Company will conduct periodic reviews and testing of all elements of its compliance program to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and the Company's Code of Conduct and anti-corruption compliance policies and procedures, taking into account relevant developments in the field and evolving international and industry standards.

22.       The Company will ensure that compliance and control personnel have sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing of transactions.

*Analysis and Remediation of Misconduct*

23.       The Company will conduct a root cause analysis of misconduct, including prior misconduct, to identify any systemic issues and/or any control failures. The Company will timely and appropriately remediate the root causes of misconduct. The Company will ensure that root causes, including systemic issues and controls failures, and relevant remediation are shared with management as appropriate.

**ATTACHMENT D**

**ENHANCED COMPLIANCE REPORTING REQUIREMENTS**

TRAFIGURA BEHEER B.V. (the "Company") agrees that it will report to the United States Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the Southern District of Florida (collectively, the "Offices") periodically.

During the Term, the Company shall review, test, and update its compliance program and internal controls, policies, and procedures described in Attachment C. The Company shall be required to (i) conduct an initial ("first") review and submit a first report, and (ii) conduct and prepare at least two follow-up reviews and reports, as described below. Prior to conducting each review, the Company shall be required to prepare and submit a workplan for the review. The Company shall also, at no less than three-month intervals during the Term, meet with the Offices regarding remediation, implementation and testing of its compliance program and internal controls, policies, and procedures described in Attachment C.

In conducting the reviews, the Company shall undertake the following activities, among others: (a) inspection of relevant documents, including the Company's current policies, procedures, and training materials concerning compliance with the Foreign Corrupt Practices Act ("FCPA") and other applicable anti-corruption laws; (b) inspection and testing of the Company's systems, procedures, and internal controls, including record-keeping and internal audit procedures at sample sites; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons; and (d) analyses, studies, and comprehensive testing of the Company's compliance program. If the Company engages third-party consultants or advisors to assist in conducting reviews consistent with the Plea Agreement ("Agreement") and this Attachment D, it agrees to make such third-party

D-1

consultants or advisors available to communicate with the Offices upon request, subject to applicable privilege and local law (such as relevant data protection and labor laws).

**Written Work Plans, Reviews and Reports**

1.      The Company shall conduct a first review and prepare a first report, followed by at least two follow-up reviews and reports.

2.      Within sixty (60) calendar days of the date the Court accepts the Defendant's guilty plea, the Company shall, after consultation with the Offices, prepare and submit for review and approval by the Offices a written work plan to address the Company's first review.  The Offices shall have thirty (30) calendar days after receipt of the written work plan to provide comments and approve.

3.      With respect to each follow-up review and report, after consultation with the Offices, the Company shall prepare and submit for review and approval by the Offices a written work plan within forty-five (45) calendar days of the submission of the prior report.  The Offices shall provide comments within thirty (30) calendar days after receipt of the written work plan.

4.      All written work plans shall identify with reasonable specificity the activities the Company plans to undertake to review and test each element of its compliance program, as described in Attachment C.

5.      Any disputes between the Company and the Offices with respect to any written work plan shall be decided by the Offices in their sole discretion.

6.      No later than one year from the date the Court accepts the Defendant's guilty plea, the Company shall submit to the Offices a written report setting forth: (1) a complete description of its remediation efforts to date; (2) a complete description of the testing conducted to evaluate the effectiveness of the compliance program and the results of that testing; and (3) its proposals to

ensure that its compliance program is reasonably designed, implemented, and enforced so that the program is effective in deterring and detecting violations of the FCPA and other applicable anti-corruption laws.  The report shall be transmitted to:

> Deputy Chief, FCPA Unit
> Deputy Chief, CECP Unit
> Criminal Division, Fraud Section
> United States Department of Justice
> 1400 New York Avenue NW
> Washington, D.C. 20005
>
> Chief, Economic and Environmental Crimes
> United States Attorney's Office
> Southern District of Florida
> 99 NE 4th Street
> Miami, Florida 33132

The Company may extend the time period for issuance of the first report or any other report contemplated in this Attachment D with prior written approval of the Offices.

**<u>Follow-up Reviews and Reports</u>**

7.     The Company shall undertake at least two follow-up reviews and reports, incorporating the views of the Offices on the Company's prior reviews and reports, to further monitor and assess whether the Company's compliance program is reasonably designed, implemented, and enforced so that it is effective at deterring and detecting violations of the FCPA and other applicable anti-corruption laws.

8.     The first follow-up ("second") review and report shall be completed by no later than one year after the first report is submitted to the Offices.

9.     The second follow-up ("third") report shall include a plan for ongoing improvement, testing, and review of the compliance program to ensure the sustainability of the program.  The third report shall be completed and delivered to the Offices no later than thirty (30) days before the end of the Term.

10.     The Company may extend the time period for submission of any of the follow-up reports with prior written approval of the Offices.

### Meetings During the Term

11.     The Company shall meet with the Offices within thirty (30) calendar days after providing each report to the Offices to discuss the report.

12.     At least quarterly, and more frequently if the Offices deem it appropriate in their sole discretion, representatives from the Company and the Offices will meet to discuss the status of the review and enhanced self-reporting obligations, and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Offices.

### Confidentiality of Submissions

13.     Submissions by the Company, including the work plans and reports, will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the submissions could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the submissions and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent the Offices determine in their sole discretion that disclosure would be in furtherance of the Offices' discharge of their duties and responsibilities or is otherwise required by law.

**ATTACHMENT E**

<u>**CERTIFICATION**</u>

To:    United States Department of Justice
Criminal Division, Fraud Section
Attention: Chief of the Fraud Section

United States Department of Justice
United States Attorney's Office
Southern District of Florida
Attention: United States Attorney

Re:    Plea Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 13 of the Plea Agreement ("the Agreement") filed on or about March 28, 2024 in the United States District Court for the Southern District of Florida, by and between the United States of America and TRAFIGURA BEHEER B.V. (the "Company"), that undersigned are aware of the Company's disclosure obligations under Paragraph 13 of the Agreement, and that the Company has disclosed to the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Southern District of Florida (collectively, the "Offices") any and all evidence or allegations of conduct required pursuant to Paragraph 13 of the Agreement ("Disclosable Information"). This obligation to disclose information extends to any and all Disclosable Information that has been identified through the Company's compliance and controls program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes. The undersigned further acknowledge and agree that the reporting requirements contained in Paragraph 13 and the representations contained in this certification constitute a significant and important component of the Agreement and of the Offices' determination whether the Company has satisfied its obligations under the Agreement.

The undersigned hereby certify that they are the Chief Executive Officer and the Chief Financial Officer of Trafigura Group, respectively, acting on behalf of TRAFIGURA BEHEER B.V., and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Southern District of Florida. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Southern District of Florida.

Date: _____     Name (Printed): _____

                                  Name (Signed): _____
                                  Chief Executive Officer, Trafigura Group
                                  On behalf of TRAFIGURA BEHEER B.V.


Date: _____     Name (Printed): _____

                                  Name (Signed): _____
                                  Chief Financial Officer, Trafigura Group
                                  On behalf of TRAFIGURA BEHEER B.V.

**ATTACHMENT F**

**<u>CERTIFICATION</u>**

To:    United States Department of Justice
        Criminal Division, Fraud Section
        Attention: Chief of the Fraud Section

        United States Department of Justice
        United States Attorney's Office
        Southern District of Florida
        Attention: United States Attorney

Re:    Plea Agreement Compliance Certification

The undersigned certify, pursuant to Paragraph 9 of the Plea Agreement (the "Agreement") filed on or about March 28, 2024 in the United States District Court for the Southern District of Florida, by and between the United States of America and TRAFIGURA BEHEER B.V. (the "Company"), that the undersigned are aware of the Company's compliance obligations under Paragraphs 9 and 10 and Attachment C of the Agreement, and that, based on the undersigned's review and understanding of the Company's anti-corruption compliance program, the Company has implemented an anti-corruption compliance program that meets the requirements set forth in Attachment C to the Agreement. The undersigned certifies that such compliance program is reasonably designed to detect and prevent violations of the Foreign Corrupt Practices Act and other applicable anti-corruption laws throughout the Company's operations. The undersigned further certifies that based on a review of the Company's reports submitted to the Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Southern District of Florida pursuant to Paragraph 25 of the Agreement, the reports were true, accurate, and complete as of the date they were submitted.

The undersigned hereby certify that they are respectively the Chief Executive Officer and the Chief Compliance Officer of Trafigura Group and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Southern District of Florida. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Southern District of Florida.

Date: _____     Name (Printed): _____

                                     Name (Signed): _____
                                     Chief Executive Officer, Trafigura Group
                                     On behalf of Trafigura Beheer B.V.

Date: _____     Name (Printed): _____

                                     Name (Signed): _____
                                     Chief Compliance Officer, Trafigura Group
                                     On behalf of Trafigura Beheer B.V.

F-2